IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 13, 2025 Session

## KARS LLC ET AL. V. RONALD OGLE ET AL.

**Appeal from the Chancery Court for Sevier County**
No. 24-5-106     John D. McAfee, Judge[1]

_____

**No. E2025-00439-COA-R3-CV**

_____

The plaintiffs sued the defendants alleging breach of contract, breach of the duty of good faith and fair dealing, tortious interference with contract, tortious interference with business relations, fraudulent misrepresentation, unjust enrichment, and civil conspiracy. The trial court dismissed the plaintiffs' complaint after finding that the plaintiffs failed to timely close on their transactions with the defendants. The plaintiffs appeal. Following thorough review, we affirm in part, reverse in part, vacate in part, and remand the case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Vacated in Part; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, P.J. E.S., and THOMAS R. FRIERSON, II, J., joined.

Paul J. Krog, Brentwood, Tennessee; and Nicholas A. Rendino, Amit R. Vora, Jillian R. Roffer, and Joshua E. Roberts, New York, New York, for the appellants, KARS LLC, Rocky Top Ford Lincoln LLC, and Robert Henderson Development.

Nicholas W. Diegel, P. Edward Pratt, and Erika L. Hughes, Knoxville, Tennessee, for the appellees, LD&S TN LLC, Daniel L. Webb, Lynn T. Webb, and Whaley Properties Inc.

## OPINION

### BACKGROUND

On May 23, 2024, KARS, LLC ("KARS"), Robert Henderson Development 1, LLC ("RH1"), and Rocky Top Ford Lincoln, LLC ("Rocky Top") (together, "Plaintiffs") filed

_____

[1] Sitting by interchange.

a complaint against Lynn T. Webb, Daniel L. Webb, Whaley Properties, Inc. ("Whaley"), and LD&S TN, LLC ("LD&S") (together, "Defendants")[2] in the Sevier County Chancery Court (the "trial court"), alleging breach of contract, breach of the duty of good faith and fair dealing, tortious interference with contract, tortious interference with business relations, fraudulent misrepresentation, unjust enrichment, and civil conspiracy. Plaintiffs also sued Ronald W. Ogle and Betty M. Ogle (together, the "Ogles"), alleging tortious interference with contract, tortious interference with business relations, unjust enrichment, and civil conspiracy. However, Plaintiffs have since dismissed all their claims against the Ogles, and the Ogles are only discussed as necessary for context.

The complaint alleges that Rocky Top leased two parcels of commercial property from LD&S (the "LD&S Property") and two parcels of commercial property from Whaley (the "Whaley Property"). The LD&S Property and the Whaley Property (together, the "Properties") are adjacent to each other within the City of Sevierville. Each lease was for a term of five years, commencing on April 1, 2019, and contained a purchase option. Section 22.1 of the LD&S lease states as follows:

> **Right to Purchase**. Provided that (i) the Term of this Lease has yet to expire and (ii) no state of facts then exist which constitute an Event of Default, or which, with the passing of time or the giving of notice, would constitute an Event of Default, the Lessee shall have the right (at any time during the Term of this Lease) to purchase the fee simple interest of the Lessor in the Leased Premises (the "Fee Interest") by tendering written notice to the Lessor of the Lessee's exercise of this right (the "Exercise Notice") and specifying the proposed closing date (the "Closing Date") on which the Lessee intends to close the purchase of the Fee Interest (the "Closing"), which Closing Date must occur after determination of the Fee Interest Appraised Value. The Lessee's right to purchase the Fee Interest, pursuant to the terms and conditions of this Section 22, shall be referred to as the "Purchase Option."

The Whaley lease contained a substantively identical purchase option, except it also provided for the purchase of certain equipment. Plaintiffs aver that, prior to the expiration of the leases, Rocky Top contracted with KARS and RH1[3] to engage in a new joint business venture on the Properties. To facilitate this, Rocky Top and KARS executed a binding Letter of Intent (the "LOI") whereby Rocky Top agreed to exercise its option to purchase

---

[2] Plaintiffs aver that LD&S and Whaley have common ownership, that Daniel Webb is LD&S's President, and that Lynn Webb is Whaley's President.

[3] Rocky Top, KARS, and RH1 share common owners; however, neither KARS nor RH1 was a party to the leases at issue. RH1 "was formed to construct and operate the [joint venture]'s business complex," and KARS was formed to enter a lottery being conducted by the City of Sevierville for businesses wishing to obtain a license to operate a liquor store.

the Whaley Property and to lease the Whaley Property to KARS if the City of Sevierville awarded KARS a license to operate a liquor store on the premises. On January 8, 2024, KARS was awarded the liquor store license.

On February 9, 2024, Rocky Top's counsel wrote to LD&S and Whaley's counsel to notify him that Rocky Top "may be interested in purchasing both the Whaley parcel and the LD&S parcel as part of this purchase option." This February 2024 communication referenced an earlier 2023 notice letter sent by Rocky Top's counsel. The 2023 notice letter states, in relevant part:

> Pursuant to Section 2 of the Whaley Lease, Lessee hereby provides Whaley Lessor with notice of Lessee's intent to decline to exercise the Option Terms granted to Lessee under the Whaley Lease.
>
> Pursuant to Section 22 of the LD&S Lease, Lessee hereby intends to exercise its option to purchase the LD&S Premises, including the Released Parcel. In accordance with Section 22.1 of the LD&S Lease, Lessee would like to [sic] the purchase date of the LD&S Premises to be on or around April 1, 2024, subject to extension if necessary to accomplish the closing. . . .

Plaintiffs aver that Defendants' counsel responded on February 12, 2024, and confirmed that Defendants were "agreeable" to Rocky Top exercising the purchase option with Whaley. The parties' counsel began working on the necessary transactional documents, and on March 6, 2024, Plaintiffs' counsel wrote to Defendants' counsel stating:

> . . . (2) we need to know if both of your clients are agreeable to a May 1 closing date? Finally, my client got the results of the Phase I on the Whaley property back, and they are recommending a Phase II . . . . The cost of the Phase II is $24,000. My client doesn't want to commit to this cost until we know if your clients are good with the 2 items noted above. The consultant wants to start on the Phase II on Friday, so we would like to find [sic] about #1 and #2 above as soon as possible in order to decide on the Phase II.

Plaintiffs aver that "Whaley and LD&S thereafter agreed to a May 1 closing date for the purchase, which [Defendants' counsel] communicated orally to [Plaintiffs' counsel], and Rocky Top proceeded with a Phase II study in reliance on that representation." On March 25, 2024, Defendants' counsel forwarded draft closing documents to Plaintiffs' counsel for her review. In relevant part, the documents stated that the closing would be held "on May 1, 2024 or such earlier date as the [parties] mutually agree upon . . . ."

Despite this, on April 2, 2024, Defendants' counsel sent a letter to Plaintiffs' counsel stating:

- 3 -

. . . the deadline for the Lessee to exercise the Option Term in each Lease was October 4, 2023. Accordingly, the Term of each Lease is now irrevocably expired. Pursuant to Section 22 of the Whaley Lease, the Purchase Option in the Whaley Lease must be exercised during the Term of said Lease. Therefore, the Purchase Option in the Whaley Lease is now expired.

. . . [t]he Purchase Option set forth in Section 22 of the LD&S Lease was exercised by that certain letter dated June 7, 2023 from [Plaintiffs' counsel] on behalf of the Lessee (the 'LD&S Exercise Notice'). The Closing Date set forth in said LD&S Exercise Notice was April 1, 2024, which date has now passed with neither a Closing nor satisfaction of my client's conditions for an extension of said Closing Date. Therefore, my client takes the position that the Purchase Option in the LD&S Lease is now expired as well.

On April 12, 2024, ten days after Defendants' counsel sent the termination letter, General Warranty Deeds transferring ownership of the Properties from Whaley and LD&S to the Ogles were recorded with the Sevier County Register of Deeds. Plaintiffs aver that the Webbs' "decision to terminate these agreements in bad faith was done with the intent to harm Plaintiffs and punish them for having the audacity of asking the Webbs to split the cleanup fee to remediate the environmental issues on the property, and they did so with [the] Ogle[s], who had been scheming for weeks to sabotage Plaintiffs' business objectives and were all too eager to assist."

Plaintiffs allege that Defendants' conduct caused breaches of Rocky Top's leases with LD&S and Whaley, caused breaches of the contracts Rocky Top had with KARS and RH1, and "resulted in the loss of significant business opportunities for Plaintiffs." Plaintiffs' complaint sets forth twelve counts in which they aver the following: (1) LD&S breached its lease with Rocky Top; (2) Whaley breached its lease with Rocky Top; (3) LD&S and Whaley breached a duty of good faith and fair dealing owed to Rocky Top; (4) the Ogles tortiously interfered with the LD&S lease; (5) the Ogles tortiously interfered with the Whaley lease; (6) Defendants and the Ogles tortiously interfered with the LOI between Rocky Top and KARS; (7) Defendants and the Ogles tortiously interfered with an oral contract between Rocky Top and RH1; (8) Defendants and the Ogles tortiously interfered with the business relations between Rocky Top and KARS; (9) Defendants and the Ogles tortiously interfered with the business relations between Rocky Top and RH1; (10) Whaley and LD&S made fraudulent misrepresentations to Plaintiffs; (11) Defendants and the Ogles were unjustly enriched at the expense of Plaintiffs; and (12) Defendants and the Ogles conspired to harm Plaintiffs.

On June 26, 2024, Defendants filed a motion to dismiss pursuant to Tennessee Rule of Civil Procedure 12.02(6) and a supporting memorandum of law. Defendants argued that counts 1 and 2 should be dismissed because the leases and purchase options expired when

Rocky Top "failed to close on April 1, 2024, and the purported oral modification of the closing date fails as a matter of law pursuant to Tennessee's [s]tatute of [f]rauds[;]" count 3 should be dismissed because a claim for breach of the duty of good faith and fair dealing "is not an independent cause of action and requires reference to an underlying express contractual provision in the operative agreement and the breach thereof[;]" count 6 should be dismissed because the LOI is not an enforceable contract, "[t]he essential element of malice is not pleaded[,]" and "the essential element of proximate causation between Defendants' conduct and the breach of the LOI is not met[;]" count 7 should be dismissed because the oral agreement between Rocky Top and RH1 violates Tennessee's [s]tatute of [f]rauds, and Plaintiffs "fail[] to allege facts to establish the essential elements of malice and proximate causation[;]" counts 8 and 9 should be dismissed because "Plaintiffs fail to adequately plead the essential element of improper means or improper motive[,]" and "Plaintiffs' theory of improper means is excluded under the freedom of contract exception[;]" count 10 should be dismissed because "Plaintiffs fail to allege that Defendants made any misrepresentations to Plaintiffs KARS and RH1 or reliance on misrepresentations by these specific Plaintiffs[;]" count 11 should be dismissed because "Plaintiffs do not allege any benefit purportedly conferred upon Defendants by Plaintiffs[;]" and count 12 should be dismissed because "Plaintiffs do not allege any overt acts committed in concert by members of the purported conspiracy or the predicate underlying tort attributable to the conspiracy."

On September 19, 2024, Defendants filed a motion to disqualify Plaintiffs' counsel. This Court addressed the facts giving rise to this motion in *Dover v. Dover*, No. E2024-01523-COA-T10B-CV, 2024 WL 4692297 (Tenn. Ct. App. Nov. 6, 2024), *perm. app. denied* (Tenn. 2025). In short, Travis D. McCarter of the firm Green, Waters Ogle, and McCarter ("GWOM") was one of Plaintiffs' attorneys at the trial court level.[4] Jeannine Hurst Emory was Defendant Ron Ogle's personal assistant and real estate manager. Ms. Emory's office is located in the building adjacent to GWOM. Although the two businesses have separate front doors, an upstairs hallway connects GWOM and Ms. Emory's office. A door, with a simple doorknob lock, provides access between the two offices. Ms. Emory avers that she maintained "the real estate transaction files, pleadings and Mr. Ogle's legal files related to this litigation" in her office. She further alleged that on August 12, 2024, Mr. McCarter and another attorney from GWOM entered her office building while no one was present in the office, without first notifying Ms. Emory, and without Ms. Emory's authorization. Ms. Emory avers that Mr. McCarter and the other attorney knew of her relationship with Mr. Ogle and had an opportunity to access and view Mr. Ogle's legal files

---

[4] In addition to Mr. McCarter, Plaintiffs were represented before the trial court by Nicholas A. Rendino and Joshua E. Roberts of the firm Kasowitz Benson Torres LLP ("KBT"). Neither Mr. Rendino nor Mr. Roberts are licensed to practice law in Tennessee. Accordingly, they sought *pro hac vice* admission to practice before the trial court and associated Mr. McCarter and GWOM as local counsel. Mr. McCarter and GWOM do not represent Plaintiffs on appeal. However, Plaintiffs continue to be represented by Mr. Rendino, Mr. Roberts, and another KBT attorney, Jillian R. Roffer. These KBT attorneys have been granted *pro hac vice* admission to practice before this Court and have associated new local counsel on appeal.

- 5 -

while they were in her office. Defendants insisted this conduct violated Rules 3.4 and 8.4 of the Tennessee Rules of Professional Conduct and created an appearance of impropriety that required the disqualification of all of Plaintiffs' attorneys, including those that were not a part of GWOM. On January 22, 2025, the trial court denied the motion to disqualify "without prejudice based on the insufficiency of the allegations in the Motion and the Sevierville Police Department reports[.]"

Defendants' motion to dismiss was scheduled to be heard on December 16, 2024. On December 11, 2024, Defendants filed a reply to Plaintiffs' response in opposition to the motion. On December 12, 2024, Plaintiffs filed a motion to exclude Defendants' December 11 reply brief, arguing that it was untimely and "include[d] new arguments beyond the scope of Plaintiffs' oppositions . . . that substantively differ from those set forth originally." At the conclusion of the December 16 hearing, the trial court stated that it was holding the motions to dismiss in abeyance to allow the parties time to conduct discovery.

On February 24, 2025, the parties appeared before the trial court for a hearing on a motion to compel third-party discovery. Early in the hearing, the trial court began asking questions about arguments that had been raised by the parties in support of and in opposition to Defendants' motion to dismiss. Ultimately, at the end of the hearing, the trial court concluded that Rocky Top had provided the required notices to exercise the purchase options; however, it held that the 2023 notice letter, which included a proposed closing date of April 1, required Rocky Top to close on the properties on or before April 1. The trial court reasoned that Tennessee's statute of frauds required a written agreement to any extension of the closing date and found that the communications between counsel for the parties did not satisfy the statute of frauds. The trial court found that the lease and the purchase options terminated when the parties did not close on or before April 1 and that Defendants were free to sell the properties to the Ogles. Therefore, the trial court dismissed Plaintiffs' complaint with prejudice as to all claims against all parties. The trial court entered an order memorializing its ruling on March 18, 2025 (the "Dismissal Order").

On March 19, 2025, Plaintiffs filed a motion to alter or amend the judgment. In support thereof, Plaintiffs alleged that the trial court had circulated a draft order on March 4, 2025, which included findings and conclusions of the court and was intended as a "rough guide" to assist counsel in drafting the order from the February 24 hearing. In response, Defendants' counsel emailed the trial court asking the court to schedule a call for the parties to discuss the contents of the order. In a follow-up email, Defendants' counsel stated that Plaintiffs' insistence that the draft order be entered as presented to the parties by the court was "leading [the trial court] into reversible error" because "there are a few factual errors in the [trial court]'s rough guide that will serve as fodder for Plaintiffs' calls for reversal." Ultimately, the trial court entered the Dismissal Order, which does not include any findings of fact or conclusions of law in the body of the order and instead simply incorporates by reference the entirety of the February 24 hearing transcript. In their motion to alter or amend, Plaintiffs argued that the trial court's failure to include in the Dismissal Order its

findings and conclusions set forth in the draft order "violate[d] Plaintiffs' due process rights and cast serious doubt on whether the [trial court]'s final ruling is the product of its own independent judgment." Following a hearing on Plaintiffs' motion to alter or amend, the trial court entered an order on March 24, 2025 denying the motion and holding that: "Plaintiffs ha[d] not demonstrated any of the circumstances for relief under Tennessee Rule of Civil Procedure 59.04, and the [Dismissal Order] accurately memorializes the ruling of the [trial court] granting the Defendants' *Motions to Dismiss*." The order also struck from the record a copy of the draft order that had been attached as an exhibit to Plaintiffs' motion to alter or amend, concluding that it was "immaterial and impertinent."

Plaintiffs timely appealed.

## ISSUES

Plaintiffs raise four issues on appeal:

1. Whether the Trial Court erred in dismissing Plaintiffs' breach of contract claims, where [] Rocky Top, as tenant-purchaser, exercised an option to purchase and, pursuant to the option's terms, submitted an approximate "proposed" closing date, the option provision did not mandate closing on that date, but the landlord-seller repudiated the purchase transaction when the proposed date passed without a closing.

2. Whether the Trial Court erred in dismissing Plaintiffs' nine other claims, where it failed to articulate any reason for doing so.

3. Whether the Trial Court erred in considering Defendants' Reply [in support of their motion to dismiss] and expressly declining to consider Plaintiffs' Motion to Exclude the Reply.

4. Whether the Trial Court abused its discretion in striking from the Record its own draft order . . . thereby violating Plaintiffs' right to a record that provides a fair, accurate, and complete account of what transpired in the Trial Court.

Defendants raise a single issue on appeal: whether the trial court abused its discretion in denying Defendants' motion to disqualify Plaintiffs' counsel without conducting any factual inquiry. Plaintiffs argue that this issue is frivolous and that they should be awarded their fees incurred in responding to it.

## DISCUSSION

### a.

Defendants filed a motion asking this Court to consider certain post-judgment facts. Tennessee Rule of Appellate Procedure 14 grants this Court the discretion to "consider facts concerning the action that occurred after judgment." Tenn. R. App. P. 14(a). However, "consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters." *Id.*

On July 9, 2025, Plaintiffs filed a motion notifying this Court that Mr. Ogle died on May 4, 2025, and requesting a limited remand of this case to the trial court for the purpose of appointing and substituting an administrator ad litem for Mr. Ogle's estate. This Court granted the motion and remanded this case on July 21, 2025. Shortly thereafter, on July 28, 2025, Plaintiffs filed a motion to recall the case and dismiss their appeal as to the Ogles. As grounds for this motion, Plaintiffs averred that Ms. Ogle agreed to sell Plaintiffs a portion of the real property at issue in this case and that Plaintiffs agreed to dismiss their claims against the Ogles while preserving their claims against all other Defendants. On August 13, 2025, this Court recalled the limited remand to the trial court and granted Plaintiffs' motion to dismiss the Ogles from this appeal.

Defendants now ask this Court to consider three documents related to this settlement between Plaintiffs and the Ogles. Specifically, Defendants ask us to consider (1) a motion Ms. Ogle filed with the trial court on August 24, 2025, asking the trial court to dismiss the claims against the Ogles with prejudice,[5] (2) an order entered by the trial court on September 3, 2025, dismissing Plaintiffs' claims against the Ogles with prejudice, and (3) a warranty deed executed by Ms. Ogle conveying the Whaley Property to RH1. Defendants also filed a motion to dismiss this appeal in which they make arguments heavily relying on these documents. Because the facts surrounding the settlement between Plaintiffs and the Ogles are capable of ready demonstration and potentially affect the positions of the parties or the subject matter of the action, we grant the motion for consideration of post-judgment facts.

### b.

Defendants have also filed a motion to dismiss this appeal. Plaintiffs' settlement agreement with the Ogles releases all Plaintiffs' claims against the Ogles, while also making clear that it shall not "be construed to waive, release, or impair any claims

---

[5] The motion notes that this Court's August 13, 2025 order dismissing the Ogles from this appeal does not specify that such dismissal is with prejudice.

[Plaintiffs] may have against [Defendants], all of which are expressly preserved and maintained and will be continued." Despite this, Defendants argue that because Plaintiffs' complaint alleges that Defendants and the Ogles were engaged in a civil conspiracy, and Plaintiffs have since satisfied a judgment against the Ogles, the "one satisfaction rule" precludes Plaintiffs from continuing to pursue their claims against Defendants. They also argue that by settling with the Ogles without resolving their claims against Defendants, Plaintiffs have impermissibly split their cause of action and are barred by res judicata from proceeding against Defendants. Finally, they argue that the "one satisfaction rule is still good law in Tennessee" and has been codified at Tennessee Code Annotated section 29-11-104(e).

Section 29-11-104(e) provides that "[t]he recovery of a judgment for an injury or wrongful death against one (1) tortfeasor does not of itself discharge the other tortfeasors from liability for the injury or wrongful death unless the judgment is satisfied." Defendants argue that the settlement between Plaintiffs and the Ogles has been satisfied by the Ogles' transfer of the Whaley Property; thus, they argue, Plaintiffs are barred from continuing to pursue their claims against Defendants. However, this statutory language "contemplates an adversary proceeding, not a compromise settlement." *Wade v. Baybarz*, 660 S.W.2d 493, 494 (Tenn. Ct. App. 1983). Defendants erroneously argue that because the settlement agreement in this case resulted in a consent judgment against the Ogles, it is fundamentally different than the settlement at issue in *Wade*. However, the *Wade* settlement, which this Court expressly held did not implicate section 29-11-104(e), was made on behalf of a minor child and, as such, required approval of the trial court. *Id.* at 495. The settlement had been approved and confirmed by, and made a judgment of, the trial court in that case. *Id.* Therefore, it cannot be argued in good faith that this Court's focus in *Wade* was on whether the out-of-court settlement resulted in a consent judgment. Instead, this Court's focus was on whether the judgment had been obtained as the result of an adversary proceeding or was a voluntary payment. *Id.* at 494–95.

One of the purposes of the Uniform Contribution Among Tort-Feasors Act, codified at Tennessee Code Annotated section 29-11-101 et seq., "is to encourage extra-judicial settlements and promote judicial economy." *Rosenbaum v. First Am. Nat. Bank of Nashville*, 690 S.W.2d 873, 879 (Tenn. Ct. App. 1985). The Act would be thwarted if we adopted Defendants' theory, as it would discourage plaintiffs from reaching settlements with some defendants in a case if less than all the defendants in the case agreed to settle. Moreover, unlike the cases upon which Defendants rely, there has been no judicial finding that Defendants and the Ogles were joint tortfeasors, are jointly and severally liable for Plaintiffs' damages, or were engaged in a civil conspiracy. In fact, four of the twelve counts in Plaintiffs' complaint allege misconduct by Whaley and/or LD&S but do not allege any misconduct by the Ogles. Although Plaintiffs separately allege that Defendants and the Ogles were engaged in a civil conspiracy, "parties may assert alternative claims . . . and request alternative relief in a single complaint, regardless of the consistency of the claims[.]" *Benz-Elliott v. Barrett Enters., LP*, 456 S.W.3d 140, 148 (Tenn. 2015) (citations

- 9 -

omitted). It also cannot be argued that Plaintiffs intend their settlement with the Ogles to serve as a full satisfaction of their claims given that the plain language of the settlement agreement reserves their rights to continue pursuing their claims against Defendants.

Finally, Plaintiffs have not impermissibly split their causes of action. "If a plaintiff 'splits his cause of action, sues for only part of his damages, and recovers a judgment for less than the total amount of his damages,' he is precluded from bringing suit for the rest of the damages." *Nobes v. Earhart*, 769 S.W.2d 868, 873 (Tenn. Ct. App. 1988) (quoting *Hawkins v. Dawn*, 347 S.W.2d 480, 481 (Tenn. 1961)). "Principles of res judicata bar 'a second suit . . . on the same cause of action with respect to all issues which were or could have been litigated in the former suit.'" *Id.* (quoting *Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987)). However, this principle is inapposite in this case because, as Defendants concede in their motion, Plaintiffs filed a single lawsuit that included all their claims against the Ogles and Defendants. When a plaintiff dismisses with prejudice a portion of their causes of action brought in a single suit, it does not convert the remainder of the action into a second suit.

The settlement agreement between Plaintiffs and the Ogles does not provide a basis for us to dismiss Plaintiffs' claims against Defendants, and the motion to dismiss is denied.

*c.*

We now turn to Plaintiffs' first raised issue: whether the Trial Court erred in dismissing Plaintiffs' breach of contract claims. This is a question of law which we review de novo with no presumption of correctness. *Robinson v. City of Clarksville*, 673 S.W.3d 556, 566 (Tenn. Ct. App. 2023) (citing *Webb v. Nashville Area Habitat for Human., Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011)). Likewise, the interpretation of a written contract is a question of law that we review de novo. *Pandharipande v. FSD Corp.*, 679 S.W.3d 610, 618 (Tenn. 2023). As our Supreme Court has explained,

> [i]t is well settled that courts must examine the content of the entire written agreement to determine the contracting parties' intent. "Contractual terms should be given their ordinary meaning . . . and should be construed harmoniously to give effect to all provisions and to avoid creating internal conflicts." *Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). In addition, a contract's provisions must be interpreted in the context of the entire contract, "'viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illustrate another.'" *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999) (quoting *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d

- 10 -

231, 237 (Tenn. 1985)); *see also Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999).

*D & E Const. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518–19 (Tenn. 2001).

When granting the motion to dismiss, the trial court found that the parties originally agreed to close on April 1 and then agreed to extend the closing to May 1. However, it also found that counsels' communications confirming such extension did not comply with the statute of frauds. Accordingly, it held that because the closing had not occurred on or before April 1, "[D]efendants had a right to sell the property to someone else." Plaintiffs argue that Defendants should be equitably estopped from relying on the statute of frauds to disclaim the parties' agreement to extend the closing date.

"It has long been recognized in our courts that strict application of the [s]tatute of [f]rauds can lead to evils as undesirable as those it was designed to limit or prevent." *Jetton Devs., LLC v. Est. of Huddleston*, No. M2023-00026-COA-R3-CV, 2023 WL 8826580, at *6 (Tenn. Ct. App. Dec. 21, 2023) (quoting *Smith v. Smith*, No. M2004-00257-COA-R3-CV, 2005 WL 3132370, at *6 (Tenn. Ct. App. Nov. 22, 2005)). "Consequently, it should not be used to avoid contracts or to grant a privilege to a person to refuse to perform what he has agreed to do." *Id.* (internal quotation omitted). "In order to prevent such results, our courts have held that in some circumstances a party is estopped to assert the [s]tatute of [f]rauds to avoid contractual undertakings in the interest of equity and fairness." *Id.* As the Tennessee Supreme Court has explained,

> [t]he doctrine of equitable estoppel requires evidence of the following elements with respect to the party against whom estoppel is asserted:
>
> > (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts.
>
> *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990) (quoting *Callahan v. Town of Middleton*, 41 Tenn. App. 21, 292 S.W.2d 501, 508 (1954) (citation omitted)). Equitable estoppel also requires the following elements with respect to the party asserting estoppel:
>
> > (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct

- 11 -

of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially.

*Id.*

*Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004). Put simply, "once a party acts, or refrains from acting, in such a way as to indicate agreement, and another party reasonably relies on that indication of agreement, the first party cannot later assert a contrary position." *Jetton Devs.*, 2023 WL 8826580, at *7 (quoting *Smith*, 2005 WL 3132370, at *8).

"The party invoking the doctrine of equitable estoppel has the burden of proof." *Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 460 (Tenn. 2012) (citing *Hardcastle v. Harris*, 170 S.W.3d 67, 85 (Tenn. Ct. App. 2004)). Defendants note that Plaintiffs did not use the term "equitable estoppel" in their complaint; however, "[w]hile estoppel is a defense that must be affirmatively plead in a defensive pleading, under Rule 8.03 of the Tennessee Rules of Civil Procedure, there is no such requirement for a complaint." *Bland v. Allstate Ins. Co.*, 944 S.W.2d 372, 378 (Tenn. Ct. App. 1996); *see also Fahrner v. SW Mfg., Inc.*, 48 S.W.3d 141, 144 n.1 (Tenn. 2001) (holding that a plaintiff who used the term "equitable estoppel" in his argument for the first time when before the Tennessee Supreme Court had not waived his equitable estoppel argument when he had "discussed *all* the relevant facts before the" lower courts and only failed to "use the right label"). Moreover, as always when considering a motion to dismiss, the trial court must "construe the complaint liberally, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences." *Redwing*, 363 S.W.3d at 456 (quoting *Webb*, 346 S.W.3d at 426).

In this case, Plaintiffs' complaint alleges that on March 6, 2024, Plaintiffs' counsel emailed Defendants' counsel and told him that Rocky Top was preparing to pay $24,000 for an environmental study to be completed on the Whaley Property but that Rocky Top did not want to incur such cost until it knew if Whaley and LD&S would agree to extending the closing date to May 1. The complaint further alleges that Defendants' counsel thereafter orally notified Plaintiffs' counsel that Whaley and LD&S had agreed to the May 1 closing date and that Rocky Top proceeded with the environmental study in reliance on that representation. To that end, on March 25, Defendants' counsel forwarded a draft purchase and sale agreement to Plaintiffs' counsel. That draft stated that the closing date was to be May 1, 2024. Moreover, the complaint alleges, Defendants' counsel and Plaintiffs' counsel communicated two more times in the week leading up to April 1, on March 27 and 28, about the environmental study results. However, mere days later, on April 2, 2024, Defendants' counsel notified Plaintiffs' counsel that Whaley and LD&S believed the purchase options had expired due to Rocky Top's failure to close on April 1 and that Whaley and LD&S would not be selling the properties to Rocky Top. Plaintiffs allege that Defendants' decision to terminate the agreements was made in bad faith with

intent to harm Plaintiffs. In fact, Plaintiffs allege that by April 12, 2024, Whaley and LD&S had sold the properties to the Ogles.

These allegations sufficiently allege equitable estoppel at the motion to dismiss stage. As Plaintiffs note, the Ogles completed their purchase of the properties within days of the termination of the parties' agreement, whereas Rocky Top had spent weeks conducting due diligence, and Plaintiffs' counsel had spent weeks communicating with Defendants' counsel to prepare for a May 1 closing date. Whether Defendants' counsel knew of his clients' plans, it is reasonable to infer based on the allegation in the complaint that Whaley and LD&S decided prior to April 1 not to sell the properties to Rocky Top. It is also reasonable to infer that Whaley and LD&S chose to conceal that fact even though they knew Rocky Top was incurring significant costs in obtaining the environmental study in reliance on the purported May 1 closing date. This satisfies the first part of the *Osborne* test with respect to the party against whom estoppel is asserted. Turning to the second part of the *Osborne* test, it is reasonable to infer that Rocky Top, the party asserting estoppel, did not know that Whaley and LD&S had decided not to sell it the properties and had no means to discover such fact, that Rocky Top relied on Defendants' counsel's representation that it had until May 1 to close, and that Rocky Top incurred the cost of the environmental study to its prejudice. Defendants argue that Rocky Top could have acted to protect its interest by executing the purchase and sale agreement that included the May 1 closing date prior to April 1; however, it is reasonable to infer that Rocky Top had no reason to believe that it was necessary to do so in order to protect its interests based upon Defendants' counsel's prior representations.

Because Plaintiffs sufficiently plead equitable estoppel, although they did not expressly use such term, Defendants' argument that the statute of frauds defeats the parties' agreement to extend the closing date fails. Therefore, the trial court erred in dismissing Rocky Top's breach of contract claims against Whaley and LD&S, and we reverse.

*d.*

Next, Plaintiffs argue that the trial court erred by dismissing the remainder of Plaintiffs' claims without articulating any reason for doing so. The trial court's written order simply states that the motion to dismiss is granted without providing a basis for such dismissal, and the transcript of the trial court's oral ruling incorporated therein does not further elucidate the court's reasoning.

Although trial courts are not required to make written findings of fact and conclusions of law when granting motions to dismiss, Tenn. R. Civ. P. 52.01, this Court's ability to review a trial court's order granting a motion to dismiss may be hampered when such order "does not apply any legal standard or contain legal conclusions regarding the sufficiency of the complaint or provide any reasoning for the dismissal." *Buckingham v. Tenn. Dep't of Corr.*, No. E2020-01541-COA-R3-CV, 2021 WL 2156445, at *3 (Tenn. Ct.

App. May 27, 2021). As such, "[t]his Court has previously vacated a trial court's Rule 12.02 dismissal where the order of dismissal did not sufficiently explain the basis for the dismissal." *Id.* (citing *Huggins v. McKee*, No. E2014-00726-COA-R3-CV, 2015 WL 866437 (Tenn. Ct. App. Feb. 27, 2015)); *see, e.g., Blount v. Weigel's Stores, Inc.*, No. E2023-01835-COA-R3-CV, 2025 WL 2158999 (Tenn. Ct. App. July 30, 2025), *no perm. app. filed*.

Because the trial court's order does not explain the basis for its dismissal of the remainder of Plaintiffs' claims against Defendants, we vacate the trial court's dismissal of those claims.

*e.*

Plaintiffs also argue that the trial court erred by considering Defendants' reply in support of their motion to dismiss and failing to consider Plaintiffs' motion to exclude such reply. Specifically, Plaintiffs argue that Defendants filed their reply "filled with additional grounds and arguments that read more like a new motion than a reply" on December 11, 2024, less than five days before Defendants' motion to dismiss was to be heard on December 16, 2024. In other words, Plaintiffs argue that Defendants waived certain arguments at the trial court level by failing to timely make such arguments in support of their motion to dismiss. The Dismissal Order simply states that the motion to exclude "was filed but was not considered by" the trial court. The order does not state, and we are unable to discern from the transcripts attached to the Dismissal Order,[6] whether the trial court considered Defendants' reply in ruling on the motion to dismiss.

Plaintiffs rely upon Tennessee Rule of Civil Procedure 6.04(1), which requires that "[a] written motion . . . and notice of the hearing thereof shall be served not later than five days before the time specified for the hearing . . . ." Because this period is less than eleven days, "intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation" of this five-day period. Tenn. R. Civ. P. 6.01. These rules are structured, in relevant part, "to prevent a party from raising a defense at the last possible moment and thereby prejudicing the opposing party's opportunity to rebut the defense." *George v. Bldg. Materials Corp. of Am.*, 44 S.W.3d 481, 487 (Tenn. 2001) (quoting *Sands v. State*, 903 S.W.2d 297, 299 (Tenn. 1995)). However, a trial court generally has discretion to enlarge

---

[6] As discussed above, the trial court originally heard the motion to dismiss on December 16, 2024, and held the motion in abeyance. Thereafter, during a hearing on February 24, 2025, the trial court *sua sponte* raised the issues addressed by the motion to dismiss and ultimately granted the motion. The Dismissal Order incorporates by reference the transcript from the February 2025 hearing; therefore, that transcript is part of the Dismissal Order before us for review. *Terry v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 572 S.W.3d 614, 629 (Tenn. Ct. App. 2018). Conversely, the December 2024 hearing transcript is attached to the Dismissal Order but is not incorporated therein; therefore, that transcript is not part of the Dismissal Order before us for review. However, the December 2024 hearing transcript is properly included in the record on appeal and is helpful to understanding the context in which the trial court granted the motion to dismiss.

the time period that the Rules of Civil Procedure otherwise provide a party in which to act. Tenn. R. Civ. P. 6.02; *Mead v. Tucker*, No. M2020-01512-COA-R3-CV, 2021 WL 5149957, at \*3 (Tenn. Ct. App. Nov. 5, 2021). Because our review of the trial court's dismissal of Rocky Top's breach of contract claims is de novo, any error by the trial court in failing to consider the motion to exclude is harmless. *See Summers v. Cherokee Child. & Fam. Servs., Inc.*, 112 S.W.3d 486, 509 n.27 (Tenn. Ct. App. 2002) ("Because this court is required to review the evidence in support of summary judgment and determine anew whether judgment was proper, disposition of the motions to strike is not significant to our scope or standard of review."). However, the trial court should consider the motion to exclude when considering the motion to dismiss Plaintiffs' other claims on remand.

*f.*

Plaintiffs also posit that the trial court erred by striking from the record its draft order granting Defendants' motion to dismiss. The record on appeal is meant to "convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(g). "Absent extraordinary circumstances, the determination of the trial court" regarding what is properly included in the record "is conclusive." Tenn. R. App. P. 24(e).

"As this Court has previously explained, a trial court speaks through its written orders, and the appellate courts review only the trial court's written orders." *Huggins*, 2015 WL 866437, at \*5 (citing *Alexander v. JB Partners*, 380 S.W.3d 772, 777 (Tenn. Ct. App. 2011)). Accordingly, a trial court's draft order is of no consequence to our review on appeal, particularly when that review is de novo. Therefore, we conclude that the trial court did not err in striking its draft order from the record on appeal.

*g.*

In their capacity as appellees, Defendants argue that the trial court abused its discretion by denying their motion to disqualify Plaintiffs' trial court counsel without holding an evidentiary hearing. "Disqualification of an attorney is a drastic remedy" and "invariably causes delay, increases costs, and deprives parties of counsel of their choice." *Maloney v. Maloney*, No. W2013-02409-COA-R9-CV, 2014 WL 3538553, at \*2 (Tenn. Ct. App. July 17, 2014) (quoting *In re Ellis*, 822 S.W.2d 602, 605 (Tenn. Ct. App. 1991)). "Courts should, therefore, disqualify counsel with considerable reluctance and only when no other practical alternative exists." *Id.* "A trial court's disqualification of an attorney is usually reviewed under the abuse of discretion standard." *Maloney*, 2014 WL 3538553, at \*1 (citing *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001)). However, we review a trial court's ruling on a motion to disqualify under the standard set forth in Tennessee Rule of Appellate Procedure 13(d) when the motion is based on undisputed facts and conduct that took place outside the courtroom. *Id.* (citing *In re Ellis*, 822 S.W.2d at 606). Rule 13(d) requires that we review the trial court's findings of fact "de novo upon the

record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise."

Ms. Emory's affidavit filed in support of the motion avers that Mr. McCarter, another attorney from GWOM, the county vice mayor, and an employee of the Sevier County Register of Deeds entered Ms. Emory's office without her authorization when she was not there. She further avers that the other attorney from GWOM knew that Ms. Emory handled Mr. Ogle's real estate matters; that while they were in her office, they had "unsupervised access to Mr. Ogle's personal files, some of which pertain to" this case; and that when she returned to her office, she "observed that certain of Mr. Ogle's files had been manipulated or moved from the location in which [she] left them." Ms. Emory also submitted three video clips showing the individuals in her office. As this Court previously explained,

> [t]he video came in three short segments. Each segment showed [the second GWOM attorney] on or about the couch in the lobby, [Mr.] McCarter near the front window, a second male beside the camera, out of view, except of an occasional clip of his hand, and a second female voice came [to] be heard. At no time do[ ] the clips presented show any of the participants go into or about the other rooms within the office. The video presented [] also does not show the participants enter or leave the office. It only shows them in the lobby area. There is partial audio of the participants while in the lobby. The audio seems to consist[ ] of a conversation about the potential use of the office as the participants felt it was unoccupied at least until the video camera was noticed. At this point during the video [the second GWOM attorney] makes a call to what appears to be Keneath Galyon (the owner of the building's daughter), as the name Keneath can be heard. At the end of the conversation it can be heard they are discussing how they are leaving as unknown individuals are going to go out the front door and [Mr.] McCarter and [the second GWOM attorney] go back across through the upstairs. However, the video [] does not show the participants leaving.

*Dover*, 2024 WL 4692297, at \*9. In opposition to the motion to disqualify, Plaintiffs filed a copy of a Sevierville Police Department Offense / Incident Report.[7] The author of the report states that "[b]ased on the statements of all parties, along with corroborating the

---

[7] In their efforts to collect evidence in support of their motion to disqualify, Defendants issued subpoenas to the four individuals who purportedly entered Ms. Emory's office. These individuals each filed a motion to quash, or otherwise objected to the subpoenas, and attached this police report as an exhibit thereto. Defendants then filed a motion to compel, wherein they argued that the police report "lacks any evidentiary weight[,]" contains hearsay statements, and "cannot be used as a basis to defeat the subpoenas." Thereafter, at the November 24, 2025 hearing, Defendants' counsel argued that "the only admissible facts" before the trial court related to the motion to disqualify "establish that Mr. Ogle's documents are maintained in" Ms. Emory's office. However, counsel never actually objected to the trial court considering the police report when ruling on the motion to disqualify.

phone conversation at the time of the incident, there is no trespassing with the intention [to] commit a burglary, felony or misdemeanor. [Assistant District Attorney] Marsh was in agreement with this conclusion." The trial court denied the motion to disqualify "without prejudice based on the insufficiency of the allegations in the Motion and the Sevierville Police Department reports[.]"

A motion must be supported with more than insinuation based on mere speculation to justify the drastic remedy of disqualification. *Clinard*, 46 S.W.3d at 187. Even disregarding the police report, the allegations in Defendants' motion and the evidence filed in support thereof do not rise above the level of speculation and insinuation. Accordingly, the trial court did not err in denying Defendants' motion to disqualify, and we affirm.

*h.*

Finally, Plaintiffs request their attorney's fees incurred in responding to Defendants' raised issue, which Plaintiffs argue is frivolous.

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. "A frivolous appeal is one that is devoid of merit, *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978), or one that has no reasonable chance of succeeding." *Young v. Barrow*, 130 S.W.3d 59, 67 (Tenn. Ct. App. 2003) (citing *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977)). On one hand, section 27-1-122 "must be interpreted and applied strictly so as not to discourage legitimate appeals . . . ." *Davis*, 546 S.W.2d at 586. On the other hand, "[s]uccessful litigants should not have to bear the expense and vexation of groundless appeals." *Id.* Given the competing considerations, whether to award damages under section 27-1-122 rests soundly within the reviewing court's discretion. *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009) (citing *Whalum v. Marshall*, 224 S.W.3d 169, 180–81 (Tenn. Ct. App. 2006)).

We cannot say that Defendants' issue rises to the high level of frivolity under section 27-1-122. Under the circumstances, we exercise our discretion to deny Plaintiffs' request for fees.

## CONCLUSION

The judgment of the Chancery Court for Sevier County is hereby affirmed in part, reversed in part, and vacated in part; and this case is remanded for further proceedings consistent with this opinion. Costs on appeal are assessed jointly and severally to the

appellees, LD&S TN LLC, Daniel L. Webb, Lynn T. Webb, and Whaley Properties Inc., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE